## Case No. 15,660.

UNITED STATES ex rel. BULL et al. v. McCLAY.

[4 Cent. Law J. 255; 23 Int. Rev. Rec. 80; 15 Alb. Law J. 257; 24 Pittsb. Leg. J. 140.] [1]

District Court, D. Nebraska.    Feb., 1877.

KIDNAPPING—EXTRADITION—ARREST ON REQUISITION—JURISDICTION—HABEAS CORPUS.

1. In the trial upon writ of habeas corpus, in a case involving an alleged kidnapping, it is proper to allow the relators to go behind the indictment for the purpose of showing (1) the identity of the parties, and (2) that the relators were indicted for acts alleged to have been done under a requisition of the executive of one of the states of the Union; but it is incompetent in such cases to show that the indictment, upon which the requisition was issued, was procured improperly, or upon insufficient evidence.

2. Federal courts have jurisdiction to issue the writ of habeas corpus when parties are held in custody under state laws, for acts done by virtue of requisitions by the executive of one state upon the executive of a sister state.

3. The extradition act of 1793 construed and commented upon.

At law.

Lamb, Billingsley & Lamberton and R. E. Knight, for relators.

James Hunter and E. E. Brown, for respondent.

Geo. S. Smith, State Dist. Atty.

DUNDY, District Judge. On the 7th day of February, Jesse A. Bull and William Turtle, the relators, through their counsel, presented to me their complaint in writing, properly verified, setting forth in substance, that they were restrained of their liberty and unlawfuly imprisoned by Samuel McClay, sheriff of Lancaster county, the respondent; that they were so restrained and imprisoned solely for acts lawfully done by them under and by virtue of the constitution and laws of the United States; that the state of Nebraska was proceeding to try and seeking to convict and punish them for said acts in violation of the constitution of the United States, and the laws made in pursuance thereof; that the respondent claimed the right to hold the said relators, by virtue of a capias issued by authority of law from the state district court of Lancaster county; that the capias was based upon an indictment found by the grand jury of said county in May, 1876, against the relators, for kidnapping one John H. Blair, on or about the 6th day of November, 1875; that the laws of the United States specially and specifically authorized the relators to do the acts complained of, and for which they were indicted; that the said Blair had been indicted in Cook county, state of Illinois, for the crime of perjury there committed, and had fled to the state of Nebraska, when and where he was duly arrested as a fugitive from justice; that the governor of the state

[1] [Reprinted from 4 Cent. Law J. 255, by permission. 15 Alb. Law J. 257, and 24 Pittsb. Leg. J. 140, contain only partial reports.]

of Illinois issued his requisition in due form upon the governor of Nebraska, demanding the surrender and return of the said Blair to the state of Illinois, that Jesse H. Bull was duly appointed messenger to receive and convey to said state the said Blair; that the governor of the state of Nebraska duly honored the said requisition, and caused the arrest of said Blair, who was properly and lawfully delivered to the said messenger; that said Turtle was present assisting said Bull, at his request, and that the several things here enumerated are the identical acts for which they were indicted, and are now held in custody.

The complaint was deemed sufficient to require the issuing of a writ of habeas corpus, which was done as prayed for therein. The respondent lived at a greater distance than twenty miles, and a less distance than one hundred miles, from Omaha City, the place fixed for hearing. This fact made it necessary to issue the writ in such manner as to give the respondent ten days from the time of serving the writ on him in which to make his return and produce the relators. The writ was issued on the 7th day of February, and on the 14th day of same month the respondent made return to the writ, and produced the relators as he was commanded to do. The return to the writ shows clearly enough that the respondent then held the relators on a capias duly issued from the district court of Lancaster county, as stated in the complaint. When the writ was returned, the relators filed a replication to the return, reiterating the substance of the petition or complaint. Counsel for the respective parties being present, and all being anxious to proceed without further delay, the hearing was at once entered upon. Proceedings were had "in a summary way to determine the facts of the case, by hearing the testimony and arguments" for the purpose of disposing of the relators, "as law and justice require," as provided by section 761 of the Revised Statutes of the United States.

When hearing commenced a question was raised involving the right of the relators to go behind the indictment found against them in Lancaster county for kidnapping Blair. I then held that the relators might properly do so, for two reasons: First. For the purpose of showing that the John H. Blair described in the indictment for kidnapping, was the identical Blair indicted for perjury in Cook county, and demanded by the governor of Illinois from the governor of Nebraska, as a fugitive from justice. Second. For the further purpose of showing that the relators were indicted for what they did in removing Blair from the state of Nebraska on the requisition of the governor of Illinois. I also then held that no testimony, whatever, would be received to show that the grand jury in Cook county, state of Illinois, acted improperly, or had not sufficient evidence before it to justify the finding of the indictment against Blair for perjury. Subsequent

reflection and further consideration of these matters only convince me of the correctness of the rulings then made. Whether the grand jury of Lancaster county had, or had not sufficient evidence before them to justify the finding of the indictment against the relators for kidnapping Blair or whether the indictment against them is a good and valid one, technical and sufficient in form, are questions with which we have nothing whatever to do; for the reasons stated, viz.: That the inquiry was limited to the identity of Blair, and the character, nature and identity of the offence for which the relators stand indicted. Inquiry respecting the indictment of Blair in Cook county, and the extradition papers issued for him by the governor of Illinois, was limited to the regularity of these proceedings. Nothing transpired during the hearing to convince me that this view is wrong, nor is it believed that its soundness can be successfully questioned. It would result from this that even if the indictment against the relators was baseless and groundless, and the capias on which they were held was, or is, absolutely void, and that one or both of them were informal and utterly worthless, yet I think this proceeding could not be sustained and the relators properly discharged unless they are held for some act done and committed or omitted under and in pursuance of the constitution of the United States or some act of congress made pursuant thereto. This is viewing the matter from the most favorable standpoint for the relators. But we are not required to go so far in the case before us. An inspection of the indictment against the relators shows it to be sufficiently technical and good, and the capias on which they are held seems to be regular on the face thereof.

This much I have thought it necessary to say in explanation of questions which arose whilst the testimony was being taken and also for the purpose of indicating in a general way what the practice will be in similar cases hereafter. This case possesses an unusual degree of interest, not only on account of the number and ability of the counsel engaged for the respective parties, but because of the unusual amount of intelligence possessed by each of the relators, and the witness Blair, who is claimed to be the kidnapped victim. Additional interest attaches to it in consequence of the great and extended notoriety it has attained. It has heretofore engaged the attention of our own government and that of Great Britain. Diplomacy effected the release of Blair from a British prison and returned him in triumph to our own country. The action taken by this government in behalf of Blair; the action taken by the British government which led to Blair's release and return to this country; the extended newspaper comments thereon in the two countries; the proceedings in the courts already commenced and hereafter to be instituted and the important questions involved,

both national and state, bid fair to make this one of the most important cases ever brought before one of the courts of the United States. I think I fully realize the importance and magnitude of the issues involved and questions to be determined, and have tried to meet them in a manner commensurate to their great importance.

To show the detention and imprisonment of the relators to be wrong and unlawful, they produce an exemplified copy of an indictment found by the grand jury of Cook county, state of Illinois, in which one John H. Blair is formally and properly indicted for the crime of perjury alleged to have been committed in that county. The indictment seems to have been filed in the criminal court for that county, on the 1st day of November, 1875. On the 2d day of November of the same year, the governor of the state of Illinois issued his requisition, in due form, upon the governor of the state of Nebraska, demanding the arrest and extradition of the said John H. Blair, who was claimed to be a fugitive from justice from the state of Illinois, and was believed to have taken refuge in the state of Nebraska. On the same day, the governor of the state of Illinois appointed and duly commissioned as his messenger, Jesse A. Bull, one of the relators, for the express purpose of receiving and conveying the said Blair to the state last named. On the 6th day of the same month, the governor of the state of Nebraska, issued his warrant in due form of law, directing the arrest of said Blair, and also directing that he be delivered to said Bull, who was authorized by the governor of Illinois to receive him. Parol testimony produced before me shows conclusively that Blair was soon after arrested on this warrant and turned over to the relator Bull as the messenger appointed to receive him, and that he was removed from the state of Nebraska by the said Bull as he seemed authorized to be; and that no unnecessary force was used to effect such removal. The relators and Blair all unite in their testimony to establish the truth of these propositions, and they are no longer open to doubt. Neither is it claimed, nor could it be denied, that relator Turtle was acting as the assistant of the said messenger. The testimony of these three witnesses shows clearly that they went from Lincoln to St. Louis, Missouri, where they stopped for some time, but for what particular purpose does not fully appear. In this there is but little, if any, substantial difference between the testimony of the three witnesses. Down to this point there is no apparent real conflict in testimony given by the three witnesses. Here is where the irreconcilable conflict in the testimony commences; and the difference between the statements of Bull and Turtle on the one side, and Blair on the other, is as great as the difference between truth and falsehood. About one thing, however, there is no dis-

pute, and that is that Blair was never taken to Cook county on the warrant to answer the indictment there found against him. But instead of taking him there as ought to have been done, he was taken through the states of Illinois, Indiana, Ohio, Pennsylvania and New Jersey, to New York City, where he either went on board of a steamer, or as he claims, he was forced on board, and went from there to England. On reaching Great Britain he was at once arrested, and confined some three or four months in an English prison, where he was detained until demanded by this government and released by the government of Great Britain. The relators claim and positively swear that the design to take Blair to New York instead of Chicago was first formed at St. Louis after they had left this state with Blair; and the testimony of Blair seems to confirm that of the relators in that respect. Bull swears positively that this arrangement was agreed to by Blair, and that Blair went with him to New York of his own free will. Yet he paid Blair's railroad fare and other expenses from St. Louis to New York. Bull and Turtle both swear positively that Blair went on board an English steamer in New York harbor, and voluntarily started for England. Yet his hotel bill in New York and his passage to Liverpool were paid by some one other than himself. If all this be so, it shows a sort of benevolence, liberality and disinterestedness such as no other country has ever known. And yet it may all be true. On the other hand, Blair states that he supposed he was going to Chicago, and desired to go there, but was forced to go to New York, and from there to England, by the relators. He would have us believe that Bull alone, without the use of physical force, without his even being handcuffed, took him to New York, where he claims the relators and one other forced him on the vessel which he supposed was to sail for Boston instead of Liverpool. The journey from St. Louis to New York was made on passenger trains on railroads, and the route taken was through Indianapolis, Pittsburg and Philadelphia. Yet the said Blair knew that no legal process existed for taking him to any other place than Chicago, and made no effort to leave said Bull, neither did he in any way make known to any one about him, or where he went, that he was wrongfully held in custody, until he was placed on board the steamer, and then, as he states, he informed the captain of the steamer of the fact, but not until they were many miles out to sea. But even that the captain of the steamer swears to be untrue. That as intelligent a man as Blair seems to be should pass through the great cities of St. Louis, Indianapolis, Pittsburg, Philadelphia and New York, in custody of another, knowing that no authority existed therefor, and being around and about thousands of people who would have gone to his rescue if outcry

had been made, passes comprehension, and seems to me almost incredible. Yet he would have us believe this to be true. Incredulity under such circumstances, if not wholly justifiable, may, at least, be pardonable. And it would perhaps be doing no great injustice to any of the witnesses to say that neither version of the parties to this remarkable transaction is taken or believed with full and implicit confidence of truthfulness.

The authority under which the writ was invoked and these proceedings are had, must be sustained, if at all, under section 753 of the Revised Statutes of the United States. That section embodies most of the legislation of congress, had since the formation of the government on the subject of the jurisdiction of the federal courts in cases of habeas corpus. That portion of the section which is material to consider for present purposes, is as follows: "Sec. 753. The writ of habeas corpus shall in no case extend to a prisoner in jail unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof, or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process or decree of a court or judge thereof, or is in custody in violation of the constitution or of a law or treaty of the United States. * * *" If one of the federal courts or a judge thereof has the jurisdiction to issue a writ of habeas corpus and hear and determine the same, the power so to do is conferred by the section just quoted. And if I had the lawful right to issue the writ in this case and to hear the cause and determine it on its merits, that authority must be conferred by the second clause of the section which authorizes the issuing of the writ, where the petitioner "is in custody for an act done or omitted in pursuance of a law of the United States." The petition, or complaint, expressly alleges that the relators were indicted and in custody, solely for acts done and committed under a law of the United States. And it is conceded by the counsel for the relators, that, unless the acts charged against the relators were required or permitted by some act of congress so as to bring the case within the provision of the section last quoted, they must be remanded to the sheriff of Lancaster county, to be proceeded against for the crime with which they stand charged. There can no longer be any reasonable doubt about the right and jurisdiction of the federal courts and judges to issue writs of habeas corpus, and to hear and determine questions arising thereon, and to discharge a petitioner from custody when imprisoned for acts required or permitted by an act of congress, or done in connection with the execution of process issued from the federal courts, notwithstanding the petitioner may be in custody under the state law, or whether held on indictment or otherwise, for such acts or omissions. The federal courts and judges have, in numerous instances, exercised and upheld the jurisdiction invoked in such cases. And the mere question of jurisdiction would be regarded as no longer debatable in the federal courts. See U. S. v. Jailer [Case No. 15,463]; Ex parte Robison [Id. 11,934]; Ex parte Jenkins [Id. 7,259]; In re Neill [Id. 10,089]; Ex parte Smith [Id. 12,968].

I now pass to the consideration of the great question involved in this inquiry, and I fully concede the fact that it is not free from embarrassment. I refer of course to the apparent conflict of jurisdiction between the national and state tribunals. The relators state in their complaint, and counsel earnestly contend in their argument that Blair was arrested in, and removed from the state of Nebraska under, and in pursuance of the constitution and laws of the United States. The constitutional provision on the subject of extradition is found in the second subdivision of section 2 of article 4, and is as follows: "A person charged in any state with treason, felony or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled be delivered up, to be removed to the state having jurisdiction of the crime." At first view it might seem that this provision of the constitution is plain and explicit enough to accomplish the object evidently designed by it, without the aid of legislation to carry it into effect. But it had not long been in operation before grave difficulties were encountered in undertaking to enforce it. It is known that bad feeling existed, and that much indignation was expressed when the governor of Virginia refused to surrender a fugitive from justice on the requisition of the governor of Pennsylvania. It is claimed that no palliating excuse could possibly exist for such a refusal. But a strict constructionist in that day as well as the present, could probably find sufficient justification on which to base a refusal to surrender. The refusal of the governor of Virginia to surrender the fugitive was regarded by President Washington as of sufficient importance to justify him in sending a special message to congress on the subject of extradition.

This action on the part of the president finally led to the passage of an act of congress on the 12th of February, 1793 [1 Stat. 302], which has since regulated the demand for and surrender of fugitives from justice. The substance of that act, so far as it relates to the subject under consideration, is incorporated into and forms sections 5278 and 5279 of the Revised Statutes of the United States, and is as follows:

"Sec. 5278. Whenever, the executive authority of any state or territory demands any person as a fugitive from justice, of the executive authority of any state or territory

to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the state or territory making such demand, shall be paid by such state or territory.

"Sec. 5279. Any agent so appointed who receives the fugitive into his custody, shall be empowered to transport him to the state or territory from which he has fled. And every person who, by force, sets at liberty or rescues the fugitive from such agent while so transporting him, shall be fined not more than five hundred dollars or imprisoned not more than one year."

In the great case of Prigg v. Pennsylvania, reported in 16 Pet. [41 U. S.] 608, the court carefully considered the whole subject of the surrender of fugitives from justice in connection with the surrender and return of fugitives from labor. A majority of the court held in that case that these subjects were under the exclusive jurisdiction of congress, and that the state's legislature possessed no rightful jurisdiction over them. In this case it appeared that Prigg had been indicted and convicted for kidnapping a Margaret Morgan, in the state of Pennsylvania. The supreme court of the state affirmed the judgment and directed the sentence to be carried into execution. The case was removed to the supreme court of the United States, when the judgment of the supreme court of the state of Pennsylvania was reviewed and reversed, for the reason that Prigg was justified in removing the said Morgan from the state, she being a slave. The court very plainly held that the right to remove a fugitive slave, as well as a fugitive from justice, from one state to another, existed under the constitution and laws of the United States, and that state legislation could not be permitted to interfere with the exercise of that right; and that the courts of the state could not properly punish a person for what was done thereunder, so the terms of the law were not transgressed. Prigg had been convicted under a law of Pennsylvania for doing the very thing authorized and permitted by the constitution and laws of the United States. The conviction could not be sustained for that reason, and he was discharged.

In the case of Governor of Kentucky v. Governor of Ohio, reported in 24 How. [65 U. S.] 66, it is held that "Congress may authorize a particular state officer to perform a particular duty; but if he declines to do so, it does not follow that he may be coerced or punished for his refusal." If, then, congress can lawfully authorize a state officer to do a "particular thing," does it need any argument to show that the state officer cannot be punished for doing that particular thing so authorized? The constitution of the United States and the laws made in pursuance thereof are the supreme laws of the land, and anything in conflict with either must yield to their superior force and authority. The constitutional provision quoted, and also the act of congress, authorizes the governor of a state from which a fugitive from justice has fled, to demand his return from the governor of the state where the fugitive is found. This may be done when the commission of the crime is shown by indictment, or by a proper affidavit, one of which is to accompany the requisition. The governor may appoint a messenger, or agent, to receive the fugitive and convey him to the state from which he fled. The governor of the state on whom a requisition is made, is authorized to cause the arrest of the fugitive and deliver him to the messenger or agent of the other state. All this, and more, is specially provided for and authorized by the extradition law. The papers in the case under consideration were all regular and valid. The governor of Illinois issued a lawful requisition for Blair, and Bull was lawfully appointed messenger on behalf of the state of Illinois to receive him. The governor of Nebraska issued his lawful warrant, on which Blair was arrested and delivered to the messenger from Illinois. These were "officers of states," and each one of them did a particular thing in connection with the extradition of Blair; and each one of the "particular things" so done by each and every one of these "state officers" they were specially and specifically authorized to do by the highest authority in this land. It would seem from this reasoning, then, that the relators are actually "in custody for an act done or omitted in pursuance of a law of the United States." This would give them what seems to me to be a clear and undoubted right to the writ. And unless there is some potent reason for refusing it, they are entitled to a discharge.

In Ex parte Smith,—the Mormon prophet [Case No. 12,968].—a case not unlike the present one in some respects, the United States circuit court of Illinois held that a messenger who was authorized by the governor of Missouri to receive Smith from the governor of Illinois, was acting under a law of the United

States, and that Smith was in custody of such messenger under a law of the United States. It was no where claimed that Smith had violated any such law, or was in custody for, or charged with, such violation. He was simply charged with being an accessory to the crime of assault with intent to kill—with simply violating the criminal laws of the state of Missouri. Smith was arrested by the sheriff of Sangamon county, on the warrant of the governor of the state of Illinois, and was held by him for the purposes of extradition, when the writ of habeas corpus issued. Yet a hearing was had which led to the discharge of Smith; and I think the only ground on which the jurisdiction of the court could attach in that case was, that Smith was in custody under the provisions of a law of the United States, and that the sheriff who held him on the governor's warrant was acting under the provision of the same law. Again, in a case before referred to [U. S. v. Jailer, Id. 15,463], it was held by Judge Ballard to be immaterial whether the petitioner is held under state or federal process. If he is confined for an act done in pursuance of a law of the United States or of a process of any judge or court thereof, he is entitled to a discharge. In this case the relator was in custody of a state officer on a charge of murder. But the testimony presented at the hearing of the complaint showed that the relator was a deputy United States marshal, who had in his hands for service a writ issued by a United States circuit court commissioner, and whilst he was endeavoring to serve it, he was resisted, and killed his assailant, the party for whom the writ is issued. The learned judge discharged the relator from custody of the state officer, notwithstanding the process on which he was held was regular and valid on its face.

In Ex parte Jenkins [Case No. 7,259], the same questions were raised, and decided in the same way. It appeared that Jenkins was a deputy marshal, and undertook to arrest a fugitive slave, in doing which a serious affray occurred, in which Jenkins participated, causing his arrest under a criminal law of the state of Pennsylvania. The late Mr. Justice Grier, of the supreme court, who heard this case, discharged the relator, because he was "an officer of the United States, in confinement for acts done in pursuance of a law of the United States, and under process from a judge of the same, and had not exceeded the exigency of the process under which he acted." This same Jenkins was soon after arrested on the charge of assault with intent to kill. and whilst he was in custody of the state officer on this charge a writ of habeas corpus was issued by Judge Kane. On the hearing it appeared that Jenkins had been indicted under the state law for assault with intent to kill. But the acts charged were alleged to have been committed under an act of

congress which justified the relator in the premises, and the judge proceeded to hear the complaint on its merits, notwithstanding the relator had been indicted in the state court, and finally discharged him from custody. Other cases were cited by counsel, bearing directly on the question discussed, but enough have been referred to for present purposes.

Another class of cases has been cited by counsel for the respondent, which, when properly understood, will be found in harmony with, or at least not in opposition to, the principles on which the others are based. In Ex parte Forbes [Case No. 4,921], it very plainly appears that the court had no jurisdiction in the case before it. The petitioners were in custody of a sheriff for an alleged contempt of a state court, though it is claimed the state court which committed them had no jurisdiction over the subject matter of the suit out of which the alleged contempt had originated. There is nothing about the report of this case to show that it falls within the provisions of the habeas corpus act, but on the contrary it is pretty clearly shown that it does not, and it was for these reasons that the petition for discharge was denied. In the case of U. S. v. Rector [Id. 16,132], the court said, "when a person is in custody under the state authority, this court has no power to take the accused from such custody; nor has a state court power to remove by a habeas corpus a defendant from the custody of a court of the United States." This is undoubtedly the general rule, and it is undenied. The relators in this case were indicted in the United States circuit court of Ohio, for counterfeiting coin of the United States. When the writ was applied for they were in jail on a charge of violating a criminal law of the state, but for what offence does not appear. We are not advised as to whether or not they were charged with passing counterfeit money by the state court. But even if they were so charged the state courts might, perhaps, very properly hold and punish them for just such an act. In such a case, when the federal and state courts have concurrent jurisdiction over the offences, the court which first arrests and gains jurisdiction over the offender, will maintain it to the end. If the petitioners in this case were in custody of the state officers on process issued from the state courts, charging them with counterfeiting United States coin, or larceny, or robbery, or any other crime, no one will at this late date hold that they ought to have been discharged, or that any sort of a case was made so as to bring them within the provisions of the habeas corpus act. It was not claimed in that case that the petitioners were held in custody of the state officer, by reason of any act or thing committed or omitted in pursuance of, or permitted by an act of congress: but on the other hand we might reasonably infer

that they were in custody for the very reason they had violated both national and state laws which prohibit counterfeiting the lawful money of the United States.

Counsel for respondent earnestly claim and strenuously insist that if the relators failed to return Blair to Chicago in pursuance of the authority conferred on Bull, but instead thereof took him to New York and eventually to Liverpool without authority, they would be guilty of kidnapping; that the failure to return Blair to Chicago as directed by Governor Beveridge, was a fraudulent act, and vitiated the whole proceedings, and made the capture and removal of Blair wrongful and unlawful ab initio. There is some force in this reasoning. But it derives its force mainly from the ingenious manner in which the proposition was stated, and the very able argument made in support of it. The proof shows that Blair was indicted in Chicago for perjury, said to have been committed in connection with procuring a justice of the peace to issue a writ of replevin for goods in possession of a railroad company in Chicago. Suit was commenced by Blair, and the goods recovered, when he abandoned the suit and made no further appearance thereon. This led to the indictment. There was some testimony tending to show that Turtle had expressed an intention, or at least knew of an intention on the part of others, to take Blair to England to answer to the charge of fraudulently removing goods from that country. But there is no testimony which shows Bull had any such intention, or any knowledge of any such intention on the part of others before he reached St. Louis with Blair.

If Bull had taken Blair back to Chicago, who can doubt that he would have stood justified in all places for what he was so authorized to do? There would, then, have been no question about the validity of the capture and removal of Blair. Unquestionably Bull ought to have taken Blair back to Chicago as he was authorized to do by Governor Beveridge's warrant. But if he failed to discharge the duty then resting on him in the premises, and betrayed the trust reposed in him by the governor, and thus violated the laws of the state of Illinois, to which he may be amenable, can it therefore be said that he was guilty of the great crime of kidnapping in this state, when he was clothed with all necessary authority of law to do what was actually done in this state in and about the arrest and removal of Blair? If the process on which Blair was arrested and removed from the state was regular on its face, and therefore lawful, can it be claimed that Bull might have been arrested and held for kidnapping in any state through which they passed before reaching the state of Illinois? To do this

would be equivalent to disregarding the indictment against Blair—the requisition of Governor Beveridge and the appointment of Bull as his messenger—the warrant of Governor Garber, the arrest of Blair on the warrant of the governor, and his removal from this state on the requisition aforesaid. To do this we would be required to hold that if the officer, Bull, was dishonest and exceeded his authority as messenger and committed a wrong in removing Blair beyond the confines of Illinois, the wrongful acts so done and committed would relate back to the arrest and removal of Blair from this state, and invalidate the whole proceedings had under the requisition. I am not prepared to go to that extent. I think it would take an extreme case to justify me in holding to be criminal an act which appears to be not only harmless and justifiable, but sanctioned by the supreme law of this land. This would be carrying the doctrine of "relation" too far; and where neither the lawmaking power nor the courts have defined the duty or marked the way, I think no judge ought to undertake to follow a path that leads but to darkness and doubt. For my part, I prefer to keep within the "plain and well beaten path of duty," made so by the constant use of the courts and judges for many years past.

These views lead me to conclude:

1. That Blair was properly indicted in Cook county, state of Illinois, for the crime of perjury.

2. That the requisition, and warrant, issued by Governor Beveridge, under which Bull acted as messenger, were regular in form, and therefore valid and binding on all concerned.

3. That the warrant issued by Governor Garber, on which Blair was arrested and removed from this state was regular on its face, and was a valid and lawful one.

4. That all of these proceedings were had under and in pursuance of the constitution of the United States, and the act of congress passed in pursuance thereof, known as the "Extradition Act."

5. That any effort or attempt on the part of the state authorities to hold or punish the relators for the removal of Blair under the requisition for extradition, are without authority and void.

6. That the writ in this case was properly issued, and inquiry thereunder properly made, for the purpose of showing that the relators were held in custody for removing Blair from this state on the requisition of the governor of Illinois.

It necessarily follows that the relators have not invoked in vain the aid of this "high prerogative writ." They must, therefore, be discharged from the custody of the respondent, and it is so ordered.